**Leigh SCOVIL and Brett Scovil, Plaintiffs,**

v.

**MEDTRONIC, INC., et al., Defendants.**

**No. CV–13–02093–PHX–SRB.**

United States District Court,
D. Arizona.

Feb. 7, 2014.

Curtis G. Hoke, Miller Firm LLC, Orange, VA, Ryan Andrew Hamilton, Hamilton Law LLC, Las Vegas, NV, Trey A.R. Dayes, III, Phillips Dayes Law Group PC, Phoenix, AZ, for Plaintiffs.

Kathleen Kelly Kahn, Stephen M. Bressler, Lewis Roca Rothgerber LLP, Phoenix, AZ, Michael Kevin Brown, Reed Smith LLP, Los Angeles, CA, for Defendants.

## ORDER

SUSAN R. BOLTON, District Judge.

At issue are Defendants Medtronic, Inc., Medtronic Sofamor Danek USA, Inc., and Medtronic Vertelink, Inc.'s Motion to Sever Plaintiffs' Claims ("MTS") (Doc. 7); Defendants Medtronic, Inc., Medtronic Sofamor Danek USA, Inc., and Medtronic Vertelink, Inc.'s Motion to Transfer Plaintiff Brett Scovil's Case Pursuant to 28 U.S.C. § 1404(a) ("MTT") (Doc. 8); and Defendants Medtronic, Inc., Medtronic Sofamor Danek USA, Inc., and Medtronic Vertelink, Inc.'s Motion to Dismiss Plaintiffs' Complaint Pursuant to Fed.R.Civ.P. 12(b)(6) ("MTD") (Doc. 9).

## I. BACKGROUND

### A. Parties and General Allegations

Plaintiffs are brothers that had Medtronic INFUSE Bone Graft and LT–Cage devices ("Infuse device") implanted during back surgeries and now allege that the device caused back pain, heterotopic bone growth, and nerve damage. (Doc. 1, Compl. ¶¶ 1, 6–7.) Brett is a citizen of Nevada and Leigh is a citizen of Arizona.

(*Id.* ¶¶ 6–7.) Defendants Medtronic, Inc., Medtronic Sofamor Danek USA, Inc., and Medtronic Vertelink, Inc. are businesses incorporated in Massachusetts, Tennessee, and California with principal places of business in Minnesota and Tennessee. (*Id.* ¶¶ 8–10.) Each Defendant conducts business in Arizona. (*Id.*)[1]

Brett Scovil underwent a "two-level (L4–5 and L5–S1) anterior lumbar interbody fusion procedure using only the Infuse Bone Graft component [of the Infuse device] without the LT–Cage component" on October 24, 2006. (*Id.* ¶ 96.) He allegedly then began suffering increasingly severe back pain that his doctor, in the spring of 2013, attributed to a nerve impingement caused by "bony overgrowth" produced by the Infuse device. (*Id.* ¶¶ 97–98.) Leigh Scovil underwent "a C5–C6 anterior cervical interbody fusion procedure using the Infuse Bone Graft and LT–Cage" on October 17, 2008. (*Id.* ¶ 99.) He has allegedly "experienced increasingly severe pain in his cervical spine" and two doctors have opined that his "severe neck pain was the result of the Infuse Bone Graft he received." (*Id.* ¶¶ 100–01.)

### B. The Infuse Device

Plaintiffs allege that surgeons use the Infuse device to "surgically cure back pain." (*Id.* ¶ 2.) The device consists of two "components": (1) "a drug known as recombinant human bone morphogenetic protein–2 ('rhBMP–2')," which "is a genetically engineered version of a naturally occurring protein that stimulates bone growth" that is "placed on a collagen sponge, and delivered to health care providers . . . in a separate package"; and (2)

"a metal cage device" that "keeps the two vertebrae in place" and "acts as a scaffold to house the sponge that contains rhBMP–2." (*Id.* ¶¶ 3, 32, 38.) The device was developed to accomplish the "fusion" of vertebrae in certain spinal surgeries "through the use of biologically manufactured proteins" that would eliminate the need for a "harvest surgery" to obtain bone to graft onto the spine. (*Id.* ¶¶ 31–32.)

### C. FDA Premarket Approval ("PMA")

Defendants filed for PMA for the Infuse device on January 12, 2001 and the FDA approved the application on July 2, 2002. (*Id.* ¶¶ 33, 36.) The FDA approved labeling requiring the two components of the Infuse device to be used together. (*Id.* ¶ 38.) Plaintiffs allege that the FDA approved the device only to "be used in an Anterior Lumbar Interbody Fusion ('ALIF') procedure, involving a single-level fusion in the L4–S1 region of the lumbar spine." (*Id.* ¶ 40.)[2] They also allege that clinical trials performed prior to receiving PMA showed that there were risks associated with using the device during other spine surgeries, including "excessive bone growth in the target area." (*Id.* ¶¶ 43–44.) The FDA Advisory Committee allegedly expressed concern about the risks of using the device in procedures other than the ALIF procedure and "admonish[ed] Defendants to guard against procedures other than the specific ALIF procedure provided in the labeled application." (*Id.* ¶¶ 46–47.)

---

**1.** Defendants Wyeth, Inc., Wyeth Pharmaceuticals, Inc., and Pfizer, Inc. were dismissed from this action on December 19, 2013 by stipulation of the parties. (Doc. 22, Dec. 19, 2013 Order.)

**2.** "[O]n July 29, 2004, the FDA approved a supplement expanding the indicated spinal region from L4–S1 to L2–S1 and later granted approval for uses in certain oral maxillofacial surgeries and use of INTER–FIX Threaded Fusion Device." (*Id.* ¶ 96 n. 1)

## D. "Off–Label" Promotion

Plaintiffs further allege that after receiving PMA, Defendants proceeded to engage in an extensive campaign to promote "off-label" uses (i.e., uses not specifically contained in the FDA-approved labeling) of the Infuse device to increase sales. (*Id.* ¶¶ 59–60.) Defendants allegedly "provided millions of dollars in undisclosed payments to doctors ... who published articles in medical journals, delivered presentations at continuing medical education courses, and appeared at consulting engagements addressing off-label applications of Infuse." (*Id.* ¶ 62; *see also id.* ¶¶ 73–74 (describing findings of the United States Senate Committee on Finance that included information about Defendants' influence "in drafting, editing, and shaping the content of medical journal articles" discussing the Infuse device).) Those payments allegedly included thirty-four million dollars paid over the course of fifteen years to a doctor at the University of Wisconsin "who co-authored preliminary studies that led to the FDA's approval of Infuse." (*Id.* ¶ 63.) Defendants also allegedly distributed information about the proper dosage of rhBMP–2 for off-label applications and "sponsored a physician training program ... instructing surgeons on off-label applications." (*Id.* ¶¶ 70–71.) These efforts led to doctors using the device in off-label applications eighty-five percent of the time. (*Id.* ¶ 61.) Plaintiffs alleged that Defendants' off-label promotion efforts affected Plaintiffs' surgeons' decisions to use the Infuse device in an off-label application that caused Plaintiffs permanent damage. (*Id.* ¶¶ 102–03.)

## E. Causes of Action

Plaintiffs bring ten causes of action seeking recovery for the injuries they allegedly suffered as a result of the off-label promotion and use of the Infuse device: (1) manufacturing defect based on an allegation that the Infuse devices implanted in Plaintiffs did not "comply with the manufacturing specifications required by Infuse's Premarket Approval and Current Good Manufacturing Practices under the [Food, Drug, and Cosmetic Act ('FDCA')]"; (2) failure to warn Plaintiffs and their surgeons regarding known dangers of the off-label use of the Infuse device; (3) design defect; (4) negligence for promoting unsafe off-label uses of the Infuse device, not disclosing the risk of such use to Plaintiff's physicians, and commissioning biased studies about the product's safety; (5) fraud for failing to comply with "duties to the FDA and as described under the FDCA" and misrepresenting the device's safety to Plaintiff's physicians; (6) intentional misrepresentation for failing to comply with their duty to report accurate safety information to the FDA during the PMA process; (7) violation of the Arizona Unfair Competition Law "by proactively marketing Infuse for off-label usage, including with spinal fusion surgery in violation of FDCA regulations and Infuse's Premarket Approval" and "by misrepresenting to Plaintiffs' physician[s] the risks associated with such usage"; (8) breach of express and implied warranties for misrepresenting that off-label uses of Infuse were safe; (9) negligence per se;[3] and (10) strict liability. (Compl. ¶¶ 104–87.)

Defendants now move separately to (1) sever Plaintiffs' claims because they are citizens of different states, their surgeries were performed by doctors in different states, and their state law causes of action would therefore require the application of different states' laws; (2) transfer Brett

---

**3.** Plaintiffs concede that their negligence per se cause of action is preempted by federal law. (Doc. 18, Pls.' Opp'n to MTD ("Pls.' MTD Resp.") at 17–18.) The Court therefore dismisses that cause of action.

Scovil's case to the District of Nevada because he is a resident of the state and his surgery was performed there; and (3) to dismiss all claims as preempted by federal law. (*See generally* MTS; MTT; MTD.) The Court will address the Motion to Dismiss first and will address the other two Motions only if some of Plaintiffs' claims survive.

## II. LEGAL STANDARDS AND ANALYSIS

### A. Motion to Dismiss

#### 1. The Rule 12(b)(6) Standard

A Rule 12(b)(6) dismissal for failure to state a claim can be based on either (1) the lack of a cognizable legal theory or (2) insufficient facts to support a cognizable legal claim. *Conservation Force v. Salazar,* 646 F.3d 1240, 1242 (9th Cir.2011), *cert. denied, Blasquez v. Salazar,* —— U.S. ——, 132 S.Ct. 1762, 182 L.Ed.2d 532 (2012). Courts must consider all well-pleaded factual allegations as true and interpret them in the light most favorable to the plaintiff. *Schlegel v. Wells Fargo Bank, NA,* 720 F.3d 1204, 1207 (9th Cir. 2013). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). However, "for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.,* 572 F.3d 962, 969 (9th Cir.2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). In other words, the complaint must contain enough factual content "to raise a reasonable expectation that discovery will reveal evidence" of the claim. *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955.

#### 2. FDA Preemption

##### a. Statutory Authority

The federal government regulates the introduction of medical devices onto the market under the Medical Device Amendments ("MDA") to the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 360c–360m. *See Riegel v. Medtronic, Inc.,* 552 U.S. 312, 315, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008). The MDA categorize devices into three classes. 21 U.S.C. § 360(c). The Infuse device is a "Class III" device. (Compl. ¶ 21.) Class III devices are "subject ... to premarket approval to provide reasonable assurance of [their] safety and effectiveness." 21 U.S.C. § 360c(a)(1)(C); *see also* 21 U.S.C. § 360e (describing the procedure for obtaining premarket approval). The application for premarket approval must include, among other things, "reports of all information, published or known to or which should reasonably be known to the applicant, concerning investigations which have been made to show whether or not such device is safe and effective" and "a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and, when relevant, packing and installation of such device." 21 U.S.C. § 360e(c)(1)(A), (c)(1)(C). The FDA also reviews the device's proposed labeling to ensure that it is not false or misleading and that it describes a safe and effective use of the device. 21 U.S.C. § 360c(a)(2)(B), (d)(1)(A). After the FDA approves a device, the manufacturer cannot change the design, manufacturing process, labeling or any other attribute that could affect its safety or effectiveness without FDA approval. 21 U.S.C. § 360e(d)(6)(A)(i). The manufacturer is also required to report to the FDA any information concerning the safety of the

device that it learns after receiving pre-market approval. 21 U.S.C. § 360i. The FDA prohibits manufacturers from promoting "off-label" uses of an FDA-approved device. 21 C.F.R. § 814.80; *see also Carson v. Depuy Spine, Inc.*, 365 Fed.Appx. 812, 815 (9th Cir.2010) ("The FDA has adopted regulations that limit a drug or device manufacturer's ability to promote a drug or device for off-label use. Therefore, while doctors may use a drug or device off-label, the marketing and promotion of a class III device for an unapproved use violates Section 331 of the FDCA.").[4]

The FDA is invested with the sole authority to enforce the FDCA and MDA. 21 U.S.C. § 337. Importantly, the MDA include a preemption clause that reads:

> Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement
>
> (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
>
> (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k.

#### b. Supreme Court Authority

The Supreme Court has interpreted § 360k on three separate occasions. *See Riegel v. Medtronic, Inc.*, 552 U.S. 312, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008);

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996).

The *Lohr* case was brought by a woman who had suffered a "complete heart block" when her pacemaker failed because of a faulty lead. 518 U.S. at 481, 116 S.Ct. 2240. The pacemaker lead had been approved under the "510k" process for approving devices that are "substantially equivalent" to a device that is already on the market. *Id.* at 480, 116 S.Ct. 2240.[5] The plaintiff sued the device manufacturer in Florida state court for negligence in the "design, manufacture, assembly, and sale of the subject pacemaker" and for failing to warn her and her physician "of the tendency of the pacemaker to fail, despite knowledge of other earlier failures"; and strict liability because "the device was in a defective condition and unreasonably dangerous to foreseeable users at the time of its sale." *Id.* The defendant removed the case to federal court and moved for summary judgment "arguing that both the negligence and strict-liability claims were preempted by 21 U.S.C. § 360k(a)." *Id.*

Writing for a plurality of the Court, Justice Stevens first held that the MDA's preemption provision did not provide blanket preemption of all state law claims of design defect liability for multiple reasons. *Id.* at 487–91, 116 S.Ct. 2240.[6] Then, writing for a majority of the Court, Justice Stevens held that the plaintiffs' claims were not preempted because 510k approv-

---

**4.** Doctors are permitted to use devices for off-label applications. 21 U.S.C. § 396.

**5.** "The 510(k) notification process is by no means comparable to the PMA process; in contrast to the 1,200 hours necessary to complete a PMA review, the § 510(k) review is completed in an average of only 20 hours." *Id.* at 478–79, 116 S.Ct. 2240.

**6.** The Court notes that there is no private right of action under the FDCA and enforcement is left to the federal government, which does not seek compensatory damages on behalf of injured individuals. *See id.* at 487 n. 7, 116 S.Ct. 2240.

al did not amount to a "requirement" from the FDA that the defendant manufacture their device in a particular fashion. *Id.* at 493–94, 116 S.Ct. 2240. The Court also held that the design claims were likely not preempted because they "paralleled" federal requirements. *Id.* at 495–96, 116 S.Ct. 2240 ("Nothing in § 360k denies Florida the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements.").[7] It explained that "[t]he presence of a damages remedy does not amount to the additional or different 'requirement' that is necessary under the statute; rather, it merely provides another reason for manufacturers to comply with identical existing 'requirements' under federal law." *Id.* at 495, 116 S.Ct. 2240. The Court also held that the plaintiffs' manufacturing and labeling claims were not preempted because there were no federal requirements "specific" to the device at issue because it had been approved through the less-rigorous 510k process and because the state law duties were also general and not specific to medical devices. *Id.* at 501–02, 116 S.Ct. 2240.[8]

The Supreme Court outlined the concept of implied preemption in *Buckman,* another case involving a device approved under the 510k process. It started by indicating that there was no presumption against preemption, unlike in *Lohr,* because the issue was whether the device manufacturer's consultant had made "fraudulent representations to the FDA as to the intended use of" the device, an issue that the Court characterized as "inherently federal in character because the relationship [between the manufacturer (and its agents) and the FDA] originates from, is governed by, and terminates according to federal law." *Buckman,* 531 U.S. at 347–48, 121 S.Ct. 1012. It described the claim as one for "fraud-on-the-FDA" and held that it was impliedly preempted by federal law. *Id.* at 348, 121 S.Ct. 1012.

The Supreme Court explained that "[t]he conflict stems from the fact that the federal statutory scheme amply empowers the FDA to punish and deter fraud against the Administration, and that this authority is used by the Administration to achieve a somewhat delicate balance of statutory objectives." *Id.* The Court reasoned that state law "fraud-on-the-FDA" claims would interfere with the FDA's "difficult task of regulating the marketing and distribution of medical devices without intruding upon decisions statutorily committed to the discretion of health care professionals" that required an thorough analysis of the potential risks and benefits of a device's use. *Id.* at 350, 121 S.Ct. 1012. It feared that allowing state law claims to proceed could discourage manufacturers from seeking FDA approval for a device out of fear of facing liability under state laws if doctors used the device in an off-label manner that the manufacturer did not intend the device to be used. *Id.* at 350–51, 121 S.Ct. 1012. It also expressed concern that manufacturers would submit far more information

---

7. The Supreme Court used qualifying language because "the precise contours of [the plaintiffs'] theory of recovery ha[d] not yet been defined," but the Court thought it "clear that the Lohrs' allegations may include claims that [the defendant] ha[d] ... violated FDA regulations." *Id.* at 495, 116 S.Ct. 2240.

8. "The legal duty that is the predicate for the Lohrs' negligent manufacturing claim is the general duty of every manufacturer to use due

care to avoid foreseeable dangers in its products. Similarly the predicate for the failure to warn claim is the general duty to inform users and purchasers of potentially dangerous items of the risks involved in their use. These general obligations are no more a threat to federal requirements that would be a state-law duty to comply with local fire prevention regulations and zoning codes, or to use due care in the training and supervision of a work force." *Id.*

than was necessary to the FDA to ensure that disclosures satisfy state laws, which would increase the FDA's burden of review and slow the approval process and, ultimately, the delivery of effective medical treatments. *Id.* at 351, 121 S.Ct. 1012.

The Supreme Court last addressed the MDA preemption provision in 2008 when it decided a case involving the PMA process for the first time. *See Riegel,* 552 U.S. at 315, 128 S.Ct. 999. The plaintiff had been injured when his heart surgeon used a balloon catheter inconsistently with its FDA-approved labeling. *Id.* at 320, 128 S.Ct. 999. He and his wife brought a lawsuit against the manufacturer alleging that the device "was designed, labeled, and manufactured in a manner that violated New York common law." *Id.* The lower courts dismissed the claims as preempted under federal law because the manufacturer was "clearly subject to the federal, device-specific requirement of adhering to the standards contained in its individual, federally approved premarket approval application." *Id.* at 321, 128 S.Ct. 999 (internal quotation marks omitted).

The Supreme Court began its opinion by summarizing the PMA process as involving a finding of "reasonable assurance of [a] device's safety and effectiveness" and highlighting the fact that the FDA may "approve devices that present great risks if they nonetheless offer great benefits in light of available alternatives." *Id.* at 318, 128 S.Ct. 999 (internal quotation marks omitted). It then laid out a two-part test to determine whether state law claims are preempted under the MDA: (1) courts must determine whether the federal government established "requirements" applicable to the device in question, then, if the first question is answered affirmatively, (2) courts must determine whether the state common law claims are (a) based on state law requirements "that are different from, or in addition to the federal ones" and (b)

"relate to safety and effectiveness." *Id.* at 321–22, 128 S.Ct. 999 (internal quotation marks omitted). If all questions are answered affirmatively, the state law claim is preempted.

Applying the test to the facts in the case, the Supreme Court held that the PMA process imposes "requirements" applicable to the specific device, unlike the 510k process that the Court had held did not impose such requirements in *Lohr. Id.* at 322–23, 128 S.Ct. 999. The Court then held that, following the majority's conclusion in *Lohr,* "common-law causes of action for negligence and strict liability do impose 'requirements' and would be preempted by federal requirements specific to a medical device." *Id.* at 323–24, 128 S.Ct. 999 (alteration incorporated). It explained that any "[s]tate tort law that requires a manufacturer's [device] to be safer, but hence less effective, than the model the FDA has approved disrupts the federal scheme no less than state regulatory law to the same effect." *Id.* at 325, 128 S.Ct. 999. The Supreme Court also held that the preemption provision "does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations." *Id.* at 330, 128 S.Ct. 999.

#### c. Ninth Circuit Authority

The Ninth Circuit Court of Appeals has recently decided two cases interpreting these Supreme Court precedents. The first case involved allegations that a device manufacturer had allegedly learned about certain risks of its device after it had received premarket approval, but failed to notify the FDA before the plaintiff suffered harm. *Stengel v. Medtronic, Inc.,* 704 F.3d 1224, 1227 (9th Cir.2013) (en banc). After the FDA discovered the risk, it sent the manufacturer a warning letter, the manufacturer sent a Medical Device Correction letter to doctors, and the device was eventually recalled. *Id.* The plaintiff

was harmed after the manufacturer had learned of the risks, but before the FDA did. *Id.* He and his wife brought a state law negligence claim against the manufacturer for failing to disclose the newly discovered risks to the FDA in violation of duties established by federal and state law. *Id.* at 1226. The district court dismissed the claim as preempted by federal law. *Id.*

The Ninth Circuit began its analysis by summarizing the three Supreme Court cases addressed above. *Id.* at 1228–30. It also summarized decisions from other federal circuit courts holding that "in cases dealing with violations of the MDA outside the premarket approval process, the MDA does not preempt state-law causes of action for damages in which the state-law duty 'parallels' the federal-law duty under the MDA." *See id.* at 1231–32 (citing *Hughes v. Boston Scientific Corp.*, 631 F.3d 762 (5th Cir.2011); *Bausch v. Stryker Corp.*, 630 F.3d 546 (7th Cir.2010); *In re Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig.*, 623 F.3d 1200 (8th Cir.2010)). It then held that the plaintiffs' failure to warn claim under Arizona law was not preempted because Arizona law "has long been concerned with the protection of consumers from harm caused by manufacturers' unreasonable behavior. Plaintiffs' claim is brought under settled Arizona law that protects the safety and health of Arizona citizens by imposing a general duty of reasonable care on product manufacturers," including by requiring manufacturers to disclose risks discovered after sale. *Id.* at 1233.

In a concurrence that six other judges joined, Judge Watford provided additional explanation for why the claim was not preempted. He stated that the issue was one of framing the claim. *Id.* at 1234 (Watford, J., concurring). He noted that a state law claim for failure to warn *doctors* of newly discovered risks would be preempted because the FDA's reporting requirements do not go so far and therefore such a requirement would be "different from, or in addition to the requirements imposed by federal law." *Id.* (internal quotation marks omitted). The plaintiffs, however, had sued for failure to warn *the FDA*—a state law requirement that directly paralleled the federal requirement found in 21 C.F.R. § 803.50(a). *Id.*[9] Judge Watford then distinguished the case from *Buckman* by noting that in *Buckman* the misrepresentation had happened during the PMA process and therefore was in violation of a duty to report that exists purely on the basis of federal law whereas the misrepresentation in *Stengel* happened when the manufacturer failed to disclose information after the PMA process had concluded and therefore was perpetrated against the FDA (to whom the manufacturer owed a federal statutory duty) and "current and potential users, to whom [the manufacturer] owed an independent duty under state law." *Id.* at 1235.[10]

The Ninth Circuit's second recent decision came in *Perez v. Nidek Co., Ltd.*, 711 F.3d 1109 (9th Cir.2013). *Perez* was brought by several plaintiffs who had un-

---

**9.** Judge Watford noted that this pleading requirement created an additional difficulty at the causation stage because the plaintiffs would have to show that had the manufacturer timely notified the FDA, the FDA would have passed the information along to the plaintiffs' doctor in time to prevent their harm. *Id.*

**10.** The Supreme Court is currently considering briefing of an appeal of *Stengel*. *See Medtronic, Inc. v. Stengel*, No. 12–1351 (cert. pet. filed May 10, 2013). The Supreme Court has not yet granted certiorari but has invited the Solicitor General to file a brief expressing the views of the United States. *Medtronic, Inc. v. Stengel*, —— U.S. ——, 134 S.Ct. 375, 187 L.Ed.2d 15 (2013).

dergone laser eye surgery during which their surgeons had used a device that the FDA had approved through the PMA process in an off-label application. *Id.* at 1112. The plaintiffs alleged that the manufacturer had engaged in a campaign to convince doctors to use the device in an off-label application knowing that it was not approved for that use and that such approval was pending the completion of FDA-approved clinical trials. *Id.* After learning that the manufacturer had sent doctors computer chips that allowed them to use the machines for off-label applications, the FDA sent warning letters to both the manufacturer (warning it to stop providing the chips) and several physicians (warning them to stop using machines with the unapproved chips). *Id.* at 1112–13. Importantly, however, the plaintiffs did not allege that they were harmed in any way, whether due to the off-label promotion, the device itself, or the method in which the device was used. *Id.* at 1112. Instead, the plaintiffs brought, among others, state law claims for fraud by omission, alleging that "defendants misled [plaintiffs] by failing to disclose that the Laser was not FDA approved" for the procedures the plaintiffs underwent even though the manufacturer and the doctors either knew or should have known that the plaintiffs thought that it had been approved for that procedure. *Id.* at 1117.

The Ninth Circuit began with a summary of the three Supreme Court cases. *Id.* at 1117–18. Notably, it interpreted *Riegel* to hold that " § 360k preempted common-law claims challenging the safety and effectiveness of a medical device that had received premarket approval from the FDA." *Id.* at 1118. The panel then held that the plaintiffs' claims were expressly preempted because, in the absence of any injury, they were seeking merely to require manufacturers to "affirmatively tell patients when medical devices have not been approved for a certain use," even

though the FDA does not require such disclosures. *Id.* at 1119. It noted that this additional disclosure requirement "relates to the safety or effectiveness of the laser" and to "other matters included in a requirement applicable to the device." *Id.* (internal quotation marks omitted and alteration incorporated). Importantly, the fact that the defendants may have engaged in off-label promotion did not affect the panel's holding. Instead, the panel narrowly decided that the plaintiffs were seeking to force device manufacturers in all cases, regardless of whether they engaged in off-label promotion, to make disclosures about the risks of using their devices in a manner inconsistent with their labeling.

The Ninth Circuit also held alternatively that the plaintiffs' claim was "impliedly preempted because it conflict[ed] with the FDCA's enforcement scheme." *Id.* The panel reasoned that the plaintiffs' claim "rest[ed] solely on the non-disclosure to patients of facts tied to the scope of PMA approval." *Id.* It then cited approvingly to the Eighth Circuit's description of the " 'narrow gap' through which a state-law claim must fit to escape preemption by the FDCA: 'The plaintiff must be suing for conduct that *violates* the FDCA (or else his claim is expressly preempted by § 360k(a)), but the plaintiff must not be suing *because* the conduct violates the FDCA (such a claim would be impliedly preempted under *Buckman*).' " *Id.* at 1120 (quoting *In re Medtronic,* 623 F.3d at 1204).

#### d. *Ramirez v. Medtronic, Inc.*

This Court recently faced the issue of preemption in a case involving the exact same medical device at issue here and many of the same state law claims. *See Ramirez v. Medtronic, Inc.,* 961 F.Supp.2d 977 (D.Ariz.2013). The plaintiff in *Ramirez* also underwent a back surgery in

which the Infuse device was used and experienced pain after bone overgrowth impinged one of her nerves. *Id.* at 982, 2013 WL 4446913 at *2. She brought six causes of action: (1) fraudulent misrepresentation/fraud in the inducement, (2) failure to warn, (3) defective design, (4) misrepresentation, (5) negligence, and (6) breach of express warranty. *Id.*

The Court first distinguished the case from the Supreme Court and Ninth Circuit cases summarized above by noting that none of those cases involved allegations that a manufacturer was actively promoting an off-label use of its product. *Id.* at 989–90, 2013 WL 4446913 at *9. It also noted that off-label promotion was a clear violation of federal law. *Id.* The Court framed the issue as whether Medtronic could "with one hand violate federal law by establishing a new use, a use that the FDA has not examined, and with the other hand put forth as justification for preemption the federal regulations that admittedly govern Infuse, but were nonetheless premised on Medtronic's initial representations that Infuse would only be used in certain procedures?" *Id.* at 991, 2013 WL 4446913 at *10.

Writing in general terms, the Court concluded that the plaintiff's claims were not expressly preempted because Medtronic's off-label promotion violated federal law. *Id.* at 990–93, 2013 WL 4446913 at *10–11. The Court also concluded that the claims were not impliedly preempted because the "state law claims ... exist[ ] independent[ly] of federal law." *Id.* at 994, 2013 WL 4446913 at *13. In other words, prior to the enactment of the MDA it would have been a violation of Arizona tort law to promote unsafe uses of a medical device. The Court then addressed each claim individually and found that the claims that

depended on an allegation of off-label promotion were not preempted, while other claims were. *Id.* at 995–1003, 2013 WL 4446913 at *14–21.[11] The Court also allowed the plaintiff's claim against Medtronic for failure to notify the FDA of new reports of safety risks to proceed as identical to the claim in *Stengel. Id.* at 1002–03, 2013 WL 4446913 at *20–21. On a motion for reconsideration, the Court again emphasized Medtronic's off-label promotion as the controlling distinction from *Perez. Id.* at 1003–05, 2013 WL 4446913 at *23–24.

Important to the Court's application of the preemption doctrine was its analysis of the requirement that state law claims "parallel" federal claims to survive. *See id.* at 994–96, 2013 WL 4446913 at *13–14. The Court explained that when the Supreme Court and Ninth Circuit Court of Appeals had discussed the idea of "parallel" claims, it was in reference to the specific claims at issue in those cases and did not create a general rule that state law claims would survive preemption analysis only if they were "parallel" to a federal claim. *Id.* Because none of those cases involved claims that the device manufacturer had actively promoted the off-label use of its device, the Court found that their discussion of the "parallel" requirement did not apply to the case at hand. *Id.* It reasoned that there was no need for the plaintiff "to establish that her state law claims parallel federal requirements" because "Section 360k protects manufacturers who adhere to the federal regulatory program, but it does not expand federal law into heretofore unregulated areas" like off-label promotion. *Id.* at 996, 2013 WL 4446913 at *14. Consequently, the Court did not analyze whether there were any

---

11. The Court did dismiss some non-preempted claims for failure to state a claim. *See id.* at 1000–02, 2013 WL 4446913 at *19–20.

parallel federal claims that it found were not preempted.

### 3. Argument and Analysis

Broadly speaking, Defendant argues that all of Plaintiffs' claims are preempted by federal law and that *Ramirez* was wrongly decided. Defendant relies heavily on *Riegel* and several district court decisions from inside and outside the Ninth Circuit to support its arguments.

### a. Counts One & Three: Manufacturing & Design Defect

■ Defendants argue that Plaintiffs' manufacturing defect claim "is preempted because it would require a finding that, as a matter of law, the FDA-approved manufacturing process for the Infuse Device was defective." (MTD at 13.) They rely on three district court cases where a manufacturing defect claim against a medical device manufacturer was dismissed as preempted. (*Id.* (citing *Otis–Wisher v. Fletcher Allen Health Care, Inc.*, 951 F.Supp.2d 592, 599–600 (D.Vt.2013); *Lowe v. Medtronic, Inc.*, No. CV11–9551–R (DTBx), 2012 WL 3656468 (C.D.Cal. May 9, 2012); *Erickson v. Boston Scientific Corp.*, 846 F.Supp.2d 1085, 1093–94 (C.D.Cal.2011)).) However, only one of those cases included allegations that the manufacturer engaged in off-label promotion. *See Otis–Wisher*, 951 F.Supp.2d at 596–97. The *Otis–Wisher* court dismissed a manufacturing defect claim involving the same device at issue here because the claim did "not allege any federal requirement with which Medtronic failed to comply in manufacturing Infuse.... To award premarket approval to Infuse, the FDA necessarily found reasonable assurance of the device's safety and effectiveness." *Id.* at 599–600. The Court agrees with this reasoning. Although the FDA did not specifically approve the manufacturing process of Infuse with off-label uses in mind, it knows that doctors may use the device in an off-label manner. Accordingly, the risk of the manufacturing process being insufficient for off-label uses is necessarily a consideration in the risk-benefit analysis the FDA undertakes during the PMA process. *See* 21 U.S.C. § 360c(a)(2)(C) (requiring the FDA, in attempting to determine the safety and effectiveness of a device, to weigh "any probable benefit to health from the use of the device against any probable risk of injury or illness from such use"); *Riegel*, 552 U.S. at 325, 128 S.Ct. 999 (discussing the potential undermining effect certain state law claims would have on the FDA's risk-benefit analysis). Thus, Defendants did not violate any federal law concerning its manufacturing process, and finding that the process was unsafe would necessarily undermine the FDA's finding that the benefits of its manufacturing process for on-label uses outweighed the risks presented by off-label uses. The Court therefore finds that Plaintiffs' manufacturing defect claim is preempted. Because the same reasoning applies with equal force to Plaintiffs' design defect claim in Count Three, the Court also dismisses that cause of action as preempted.

### b. Count Two: Failure to Warn

■ Plaintiffs' failure to warn claim alleges that "Defendants had an established duty to warn of the dangers in using Infuse for off-label purposes which makes Infuse unreasonably dangerous to use without such warning." (Compl. ¶ 110.) Defendants argue that this claim fails because it would require Defendants to give warnings "beyond those specified by the FDA." (MTD at 10.) The Court agrees. The claim is substantively identical to the claim the Ninth Circuit held was preempted in *Perez* because it would create an additional duty to disclose information to patients and doctors that the FDA does not require to be disclosed. *See Perez*, 711

F.3d at 1119.[12] The Court therefore dismisses Count Two as expressly preempted.

### c. Count Four: Negligence

■ Plaintiffs' cause of action for negligence alleges that Defendants were negligent in researching, manufacturing, selling, merchandising, advertising, promoting, labeling, analyzing, testing, distributing, and marketing Infuse. (Compl. ¶ 121.) Negligence in researching, manufacturing, selling, labeling, testing, distributing, and analyzing infuse are claims preempted by federal law because they all address the safety of the device in ways that the FDA considers as part of the PMA process. The FDA found that Defendants were not negligent in carrying out those functions when it approved the PMA application and finding otherwise in this case would undermine the FDA's finding and its risk-benefit analysis. The Court will not do so and finds that those claims are preempted. *See Riegel*, 552 U.S. at 321–22, 128 S.Ct. 999.

■ However, the Court finds that Plaintiffs' allegations concerning the marketing of the device (alternatively labeled "merchandising," "advertising," and "promoting") are not preempted. Plaintiffs allege that Defendants engage in off-label promotion, which violates federal law. *See* 21 C.F.R. § 814.80; *Carson*, 365 Fed. Appx. at 815. Yet they are not suing merely because such conduct violated federal law, but rather because it violated pre-existing state common law of negligence. Thus, the Court finds that Count Four fits in the "narrow gap" of state law claims that are not preempted. *See Perez*, 711 F.3d at 1120.

### d. Counts Five & Six: Fraud, Intentional Misrepresentation

■ In light of the general allegations in their Complaint, the Court interprets Plaintiffs' fraud and intentional misrepresentation claims as alleging that Defendants knowingly concealed and misrepresented information to doctors concerning the safety of the Infuse device in the years after the FDA approved the device. (*See* Compl. ¶¶ 129–52.) Stated differently, Plaintiffs allege that Defendants knowingly made false statements to doctors while they were promoting the off-label use of the Infuse device. The Court finds that these claims are not preempted because they parallel the federal prohibition of off-label promotion and are rooted in traditional state common law claims, not violations of the MDA. *See Houston v. Med-*

---

**12.** The Court respectfully disagrees with Judge Snow's ruling in *Ramirez* that an identical claim was not preempted because "Medtronic allegedly violated federal law by, engaging in misleading off-label promotion and therefore forfeited § 360k protection." *Ramirez*, 961 F.Supp.2d at 998, 2013 WL 4446913, at *16. Off-label promotion and failing to warn of the dangers of off-label uses are not so interwoven as to require a finding that a violation of the FDA requirements in one respect will necessarily require the same finding in the other respect. Doctors are allowed to use approved medical devices for off-label uses and manufacturers are not required to warn them about such uses beyond the extent which the FDA requires in its premarket approval. *See* 21 U.S.C. § 396; *Per-*

*ez*, 711 F.3d at 1119. Plaintiffs' cause of action addresses disclosure and would require Defendants to have done something that the FDA did not require. In other words, Defendants did not violate federal law by not making the disclosures Plaintiffs believe were necessary even though Defendants allegedly violated federal law by making other representations. Violating one aspect of federal law (i.e., off-label promotion) did not create a new, otherwise unspecified federal duty concerning the consequences of that violation (i.e., warning of the risks of off-label uses that were promoted). Since Defendants' lack of disclosure did not violate the FDCA, Plaintiffs' cause of action for failure to warn is expressly preempted. *See id.*

*tronic, Inc.,* 957 F.Supp.2d 1166, 1179–80 (C.D.Cal.2013) (making the same finding in a case involving the same device).

■■■ Defendants argue alternatively that Plaintiffs have not pled these claims with sufficient particularity. (MTD at 18–19.) Federal Rule of Civil Procedure 9(b) requires all fraud claims to be pled "with particularity." In other words, "[a]verments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." *Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1124 (9th Cir. 2009). The allegations must be "specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong." *Id.* (internal quotation marks omitted and alteration incorporated).

■■■ Arizona law requires proof of nine elements to establish fraud:

(1) A representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; [and] (9) his consequent and proximate injury.

*Nielson v. Flashberg,* 101 Ariz. 335, 419 P.2d 514, 517–18 (1966).

■■■ The Court finds that Plaintiffs have pled facts sufficient to satisfy Rule 9(b). Plaintiffs allege that Defendants and their agents engaged in a campaign to convince doctors of the safety of the Infuse device for uses that the FDA did not approve and which Defendants knew were unsafe based on studies that they allegedly hid from doctors and that, as a result of these representations, Plaintiffs' doctors used the Infuse device in a manner that was unsafe and caused them harm. (*See* Compl. ¶¶ 58–76, 129–52.) These allegations are "specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong." *See Kearns,* 567 F.3d at 1124.

### e. Count Seven: Unfair Competition

■■■ Defendants argue that Count Seven is preempted because it is "premised on the assertion that the device should have been labeled differently." (MTD at 14.) [13] Plaintiffs argue that Defendants misconstrue their claim, which they argue is actually that Defendants "should not have promoted Infuse as safe in all spinal surgeries when, in fact, it was only approved for a small subset of all spinal surgeries." (Pls.' Resp. at 16.) The Court agrees that Defendants have misconstrued Plaintiffs' claim. Consequently, they have not convinced the Court that the claim is preempted. Because Defendants have made no other argument as to why the claim should be dismissed, the Court does not dismiss Count Seven. [14]

### f. Count Eight: Breach of Express & Implied Warranties

■■■ Defendants make a preemption argument concerning Plaintiffs' breach of

---

**13.** Defendants cite cases concerning consumer protection statutes to support this argument. (*See id.*) The Court does not see the commonality between consumer fraud and unfair competition claims and finds those cases unpersuasive as a result.

**14.** The Court notes that Plaintiffs have not alleged that they have a business interest in the medical device market that faces competition from the Infuse device. Accordingly, it appears doubtful that Plaintiffs could succeed on an unfair competition claim. *See* 87 C.J.S. § 24 ("The tort of unfair competition requires an illegal act by the one party that interferes with another party's ability to conduct its business.").

warranties claim, but also argue that all warranties were disclaimed. (*See* MTD at 12–13, 19.) The Court agrees that Defendants conspicuously disclaimed all warranties in a document entitled "Important Medical Information for Infuse Bone Graft/LT–Cage Lumbar Tapered Fusion Device" on file on the FDA's website. (Doc. 10, Ex. G at 3.)[15] Such disclaimers are valid under Arizona law and Plaintiffs' make no argument in their Response as to why the Court should not enforce the disclaimer. *See* Ariz. Rev. Statutes § 47–2316; (Pls.' Resp. at 17.) Consequently, the Court dismisses Count Eight because all warranties were disclaimed.

### g. Count Ten: Strict Liability

The Court dismisses Plaintiffs' strict liability claim for the same reasons stated above concerning their claims for manufacturing and design defects because their strict liability claim is merely an attempt to restate those claims under a different title. (*See* Compl. ¶ 183 ("The off-label use of Infuse, as given to Plaintiffs, was ineffective, defective, and dangerous when manufactured, designed, promoted, and instructed by Defendants, who are strictly liable for the injuries arising from its use.").)

### B. Motion to Sever

 Defendants move to sever the two Plaintiffs' claims because Plaintiffs underwent different surgeries performed by different surgeons in different states, making different facts and potentially different laws relevant to each claim. (MTS at 8–9.) For two plaintiffs to join in the same action who are not seeking joint and several relief, two conditions must be met: (1) the

right to relief each plaintiff asserts must "aris[e] out of the same transaction or occurrence or series of transactions or occurrences," and (2) some question or law or fact must be common to each plaintiff. Fed.R.Civ.P. 20.[16] If these conditions are not met, "the district court may sever the misjoined plaintiffs, as long as no substantial right will be prejudiced by the severance." *Coughlin v. Rogers*, 130 F.3d 1348, 1351 (9th Cir.1997). The Court finds that Plaintiffs' claims are improperly joined because they do not arise out of the same transaction or occurrence. Their claims arise out of separate surgeries in which the Infuse device was used in different off-label manners by different surgeons. (*See* Compl. ¶¶ 96–99.) The fact that those surgeries involved the same device allegedly promoted in the same way is not sufficient to find that they are the same transaction or occurrence and there is no reason to risk confusing jurors with what will necessarily be separate evidence of causation. In addition, there is no evidence that Plaintiffs would be prejudiced by bringing their claims separately. Accordingly, the Court severs the two Plaintiffs' claims.

### C. Motion to Transfer

 Defendants also move to transfer Brett Scovil's now severed case to the District of Nevada. (MTT at 1.) Under 28 U.S.C. § 1404(a), a court may transfer any case to another district court where the case could have originally been filed if doing so would be more convenient for the parties or in the interest of justice. The party seeking transfer must make a "strong showing" that the plaintiff's chosen forum is inconvenient to justify a transfer.

---

**15.** Defendants' request that the Court take judicial notice of the Important Medical Information document. (*See id.* at 2.) Plaintiffs have not opposed the request, so the Court takes judicial notice of the veracity of the document.

**16.** Plaintiffs do not argue that their joinder is mandatory under Rule 19 or that they are seeking joint and several relief. (*See* Doc. 19, Pls.' Opp'n to MTS at 3–4.)

*Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir.1986). Transfer is not appropriate if the result is merely to shift the inconvenience from one party to another. *Van Dusen v. Barrack*, 376 U.S. 612, 645–46, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). However, a plaintiff's choice of forum is entitled to less deference if he is not a citizen of the forum. *Saleh v. Titan Corp.*, 361 F.Supp.2d 1152, 1157 (S.D.Cal.2005).

 Defendants argue that the Court should transfer Brett Scovil's case to the District of Nevada because he underwent surgery and lives in Nevada, Nevada law will apply to his claims and the District of Nevada is more familiar with those laws, his choice of forum is accorded less deference as a non-resident of that forum, Defendants are not citizens of Arizona, and most witnesses and many relevant documents are likely to be in Nevada (MTT at 7–12.) Plaintiffs counter that transferring the case would deny Brett Scovil his choice of forum and increase litigation costs without providing any additional benefit. (Doc. 20, Pls.' Opp'n to MTT at 3–7.) Having considered these arguments, the Court finds that transfer to the District of Nevada is appropriate. Brett Scovil admittedly has no connection to Arizona other than his brother, he underwent surgery in Nevada, his surgeon and other relevant witnesses and information are also likely to be in Nevada, Nevada law will likely apply to his claims, and the increased litigation costs are speculative and may be entirely offset by reduced travel costs for Brett Scovil, his attorney, and witnesses. The Court therefore orders Brett Scovil's case transferred to the District of Nevada, Southern Division.[17]

## III. CONCLUSION

The Court dismisses as preempted by federal law all of Plaintiffs' claims except for their claims for negligence, fraud, and fraudulent misrepresentation. The Court also severs the two brothers' claims and transfers Brett Scovil's claims to the District of Nevada.

**IT IS ORDERED** granting in part and denying in part Defendants Medtronic, Inc., Medtronic Sofamor Danek USA, Inc., and Medtronic Vertelink, Inc.'s Motion to Dismiss Plaintiffs' Complaint Pursuant to Fed.R.Civ.P. 12(b)(6) (Doc. 9).

**IT IS FURTHER ORDERED** granting Defendants Medtronic, Inc., Medtronic Sofamor Danek USA, Inc., and Medtronic Vertelink, Inc.'s Motion to Sever Plaintiffs' Claims (Doc. 7).

**IT IS FURTHER ORDERED** granting Defendants Medtronic, Inc., Medtronic Sofamor Danek USA, Inc., and Medtronic Vertelink, Inc.'s Motion to Transfer Plaintiff Brett Scovil's Case Pursuant to 28 U.S.C. § 1404(a) (Doc. 8).

**IT IS FURTHER ORDERED** severing the claims of Plaintiffs and transferring Plaintiff Brett Scovil's claim to the United States District Court for the District of Nevada, Southern Division.

**IT IS FURTHER ORDERED** dismissing all Defendants sued under fictitious names.

17. According to the Complaint, Brett Scovil is a citizen of Clark County, Nevada, which is served by the Southern–Division of the District of Nevada. (*See* Compl. ¶ 6.)